Slip Op. 24-117

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **SENECA FOODS CORP.,** | |
| **Plaintiff,** | **Before: Gary S. Katzmann, Judge** |
| **v.** | **Court No. 22-00243** |
| **UNITED STATES,** | ***PUBLIC VERSION*** |
| **Defendant.** | |

## OPINION

[ All eight of Commerce's denials are sustained.  Judgment on the agency record will enter for Defendant. ]

Dated: <u>October 21, 2024</u>

<u>James M. Smith</u>, Covington & Burling LLP, of Washington, D.C., argued for Plaintiff Seneca Foods Corporation.  With him on the briefs were <u>Thomas Brugato</u>, <u>Kwan Woo (Kwan) Kim</u>, and <u>Edward J. Thomas III</u>.

<u>Tara K. Hogan</u>, Assistant Director, U.S. Department of Justice, Washington, D.C., argued for Defendant United States.  With her on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General and <u>Patricia M. McCarthy</u>, Director.  Of Counsel on the brief were <u>Tristan De Vega</u>, Attorney, and <u>Kenneth Kessler</u>, Senior Counsel, Office of the Chief Counsel for Industry and Security, U.S. Department of Commerce, of Washington, D.C.

Katzmann, Judge:  This case involves Commerce's discretion in evaluating requests for exclusion from Section 232 national security tariffs.  Plaintiff Seneca Foods Corporation ("Seneca") is the nation's largest vegetable canner and the last food company in the U.S. that still makes its own cans.  From 2020 to 2022, it faced one key impediment:  Seneca struggled to find sufficient tin mill products ("TMP"), consisting of steel, in order to manufacture its cans.  After trying and failing to source TMP domestically, Seneca placed import orders with foreign producers of TMP in 2021 and 2022.  But foreign steel came at a higher cost.  In 2018, the President imposed

Court No. 22-00243                                                                    Page 2
**PUBLIC VERSION**

25 percent tariffs on imports of specific steel articles from all countries except Canada and Mexico.

See Adjusting Imports of Steel into the United States, Pres. Proc. No. 9705, 83 Fed. Reg. 11625

(Mar. 8, 2018). That tariff was imposed pursuant to the President's authority under Section 232

of the Trade Expansion Act of 1962, 19 U.S.C. § 1862.

In October 2021, January 2022, and March 2022, Seneca submitted eight requests to the

U.S. Department of Commerce ("Commerce") for exclusion from the 25 percent tariff, arguing

that TMP was not produced in the United States in a sufficient and reasonably available amount.

Commerce denied all eight requests in April and July of 2022.[1]  Seneca then initiated this action

challenging Commerce's denials as arbitrary and capricious under the Administrative Procedure

Act, 5 U.S.C. § 706(2). On October 18, 2023, the court remanded all eight denials to Commerce

for further explanation and reconsideration.  See Seneca Foods Corp. v. United States ("Seneca

---

[1] Of the eight requests filed by Seneca:

- Five requests, filed in October 2021, were denied in April 2022.  See Bureau of Indus. & Sec., Dep't of Com., Steel Section 232 Remedy Exclusion Request, No. 257423 (Apr. 9, 2022), P.R. 1; Bureau of Indus. & Sec., Dep't of Com., Steel Section 232 Remedy Exclusion Request, No. 257428 (Apr. 9, 2022), P.R. 50; Bureau of Indus. & Sec., Dep't of Com., Steel Section 232 Remedy Exclusion Request, No. 257708 (Apr. 9, 2022), P.R. 100; Bureau of Indus. & Sec., Dep't of Com., Steel Section 232 Remedy Exclusion Request, No. 257709 (Apr. 9, 2022), P.R. 149; Bureau of Indus. & Sec., Dep't of Com., Steel Section 232 Remedy Exclusion Request, No. 257712 (Apr. 9, 2022), P.R. 198 (together, the "October 2021 Requests").

- One request, filed in January 2022, was denied in April 2022.  Bureau of Indus. & Sec., Dep't of Com., Steel Section 232 Remedy Exclusion Request, No. 275504 (Apr. 30, 2022), P.R. 247 (the "January 2022 Request").

- Two requests, filed in March 2022, were denied in July 2022.  See Bureau of Indus. & Sec., Dep't of Com., Steel Section 232 Remedy Exclusion Request, No. 283368 (July 9, 2022), P.R. 293; Bureau of Indus. & Sec., Dep't of Com., Steel Section 232 Remedy Exclusion Request, No. 283369 (July 9, 2022), P.R. 342 (together, the "March 2022 Requests").

I"), 47 CIT__, __, 663 F. Supp. 3d 1325, 1331 (2023), ECF No. 50.

Commerce again denied all eight of Seneca's exclusion requests on remand. See Remand Results (Dep't Com. Apr. 1, 2024), ECF No. 58-2. Seneca now renews its claims against Defendant the United States ("the Government") and requests that the court "(i) declare that Commerce's denials were arbitrary and capricious or otherwise unlawful under the APA; (ii) declare that Seneca was entitled to the requested exclusions from Section 232 tariffs retroactive to the date of filing; [and] (iii) instruct Commerce to grant the denied exclusions." Pl.'s Cmts. on Remand Redetermination at 32, May 1, 2024, ECF No. 62 ("Pl.'s Cmts").

The court sustains the Remand Results. None of the eight renewed denials was arbitrary and capricious or otherwise unlawful under the APA. Judgment on the agency record will enter for the Government.

## BACKGROUND

The court presumes familiarity with the history of this litigation. See Seneca I, 663 F. Supp. 3d at 1329–35. The essential facts and points of law are recounted here as relevant to the court's review of the Remand Results.

### I.    *Legal Background*

Section 232 of the Trade Expansion Act of 1962 empowers the President to impose tariffs on specific imported goods if the Secretary of Commerce determines that they are brought into the United States in "such quantities or under such circumstances as to threaten or impair the national security." 19 U.S.C. § 1862. Through Presidential Proclamation 9705, the President invoked Section 232 to impose a 25 percent tariff on certain steel articles imported into the United States from all countries except Canada and Mexico. See Proclamation, 83 Fed. Reg. 11625. The

President also authorized Commerce to create and administer a process "to provide relief from the [tariffs] for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality" or "upon specific national security considerations." Id. at 11627.

The relief process begins with the filing of an exclusion request by a "directly affected individual[] or organization[] located in the United States." 15 C.F.R. pt. 705, supp. 1(c)(1). The request must clearly identify and establish one of the two bases for exclusion: either (1) that the article "is not produced in the United States in a sufficient, reasonably available amount, and of a satisfactory quality," or (2) that "specific national security considerations" justify the article's exclusion. Id. pt. 705, supp. 1(c)(5)(i). Relevant here, an article "[n]ot produced in the United States in a sufficient and reasonably available amount" means that the article is not available "immediately" in the United States to meet the requester's specified business activities, with "immediately" defined as eight weeks or, if not possible, a date earlier than the time required for the requester to obtain the entire quantity of the product from the requester's foreign supplier. Id. pt. 705, supp. 1(c)(6)(i).

Following the exclusion request, a domestic steel producer may file an objection that refutes "the specific basis identified in, and the support provided for, the submitted exclusion request." Id. pt. 705, supp. 1(d)(4). In its objection, the domestic steel producer must "identify how it will be able to produce and deliver the quantity of steel . . . needed" as part of its obligation to "clearly identify, and provide support for, its opposition to the proposed exclusion." Id. pt. 705, supp. 1(d)(4). The "burden is on that supplier to demonstrate that the exclusion should be denied because of failure to meet the specified criteria." Submissions of Exclusion Requests and

Objections to Submitted Requests for Steel and Aluminum, 83 Fed. Reg. 46026, 46029 (Dep't

Com. Sept. 11, 2018).  The requester and objector may file a rebuttal and surrebuttal, respectively.

15 C.F.R. pt. 705, supp. 1(f)–(g).  It is further "incumbent on both the exclusion requester, and

objecting producers, to provide supplemental evidence supporting their claimed delivery times."

Id. pt. 705, supp. 1(d)(4).  Such additional evidence may include confidential or proprietary

business information ("CBI").  15 C.F.R. pt. 705, supp. 1(b)(5)(iii).  All filings in the process—

from the exclusion request to the surrebuttal—are submitted via online forms made available

through Commerce's "232 Exclusions Portal."  Id. pt. 705, supp. 1(d)–(h).  Each online form

requires the filer to certify that the information submitted is "complete and correct to the best of

[the filer's] knowledge."  See P.R. 17–18, 29, 35, 47.[2]

      Commerce's Bureau of Industry and Security ("BIS") then evaluates all filings to

determine whether the steel article meets one of the two bases for exclusion.  To determine whether

the potentially excluded steel article is produced in the United States in a sufficient and reasonably

available amount or of a satisfactory quality, BIS solicits a memorandum from the International

Trade Administration ("ITA") that presents factual findings and recommends granting or denying

the exclusion request in full or in part.  See P.R. 1.  BIS then issues a determination with an

---

[2] P.R. refers to the Public Record, which contains the eight public administrative records relevant
to this case.  See Pub. Admin. R., December 2, 2022, ECF No. 25.  C.R. refers to the Confidential
Record, which includes both public and business proprietary information ("BPI") submitted by the
parties in the course of the agency proceedings.  See Confidential Admin. R., Dec. 2, 2022, ECF
No. 24.

Seneca has also made public certain information that it had treated as business proprietary given
the "passage of time."  Pl.'s Resps. to Letter at 4 n.1, July 7, 2023, ECF No. 45.  Citations to this
now-public information, which does not appear in the Public Record as filed, will refer to the
Confidential Record.

explanation that is "responsive to any of the objection(s), rebuttal(s) and surrebuttal(s) for that submitted exclusion request." 15 C.F.R. pt. 705, supp. 1(h)(2)(i). BIS may accept and adopt the ITA's recommended findings if BIS finds that there are no overriding national security concerns that compel a grant of the exclusion request. See P.R. 1.

If the objector thereafter refuses to fulfill the requester's orders of the steel article in a sufficient and reasonably available amount or in a satisfactory quality, "the requester may submit a new request with documentation evidencing this refusal." Section 232 Steel and Aluminum Tariff Exclusions Process: Interim Final Rule, 85 Fed. Reg. 81060, 81065 (Dep't Com. Dec. 14, 2020) ("Interim Final Rule"). That new exclusion request restarts the entire process described above. If the objector continues to contest the new exclusion request, Commerce allows "the exclusion requester to document in the rebuttal the past activity with that objector." Id.

Finally, "[c]ompanies are able to receive retroactive relief on granted requests dating back to the date of the request's submission on unliquidated entries." 15 C.F.R. pt. 705 supp. 1(h)(2)(iii)(A). That means that once Commerce grants an exclusion, a requester can obtain relief from U.S. Customs and Border Protection dating back to the submission date for "unliquidated entries and for entries that are liquidated but where the liquidation is not final and the protest period has not expired." AM/NS Calvert LLC v. United States, 47 CIT __, __, 654 F. Supp. 3d 1324, 1335 (2023) (quoting Cargo Systems Messaging Service, CSMS #42566154, Section 232 and Section 301—Extensions Requests, PSCs, and Protests (CBP May 1, 2020)).

## II.    *Factual Background*

As mentioned above, Plaintiff Seneca is the largest vegetable canner in the United States and the only U.S. food company that continues to manufacture its own cans. Seneca I, 663

F. Supp. 3d at 1331.  Before 2014, Seneca had relied entirely on domestic producers of tin mill products to manufacture its cans.  Id.  But in 2014, Seneca began to source tin mill products from foreign countries, citing increasing supply shortfalls from the few U.S. suppliers with fully integrated operations.  Id.

In October 2021, January 2022, and March 2022, Seneca filed with Commerce a total of eight requests for the exclusion of certain steel articles from tariffs imposed under Section 232 of the Trade Expansion Act of 1962.  Seneca I, 663 F. Supp. 3d at 1328, 1331.  Seneca's requests sought exemptions for imported tin-free steel ("TFS") from Japan and China and prime electrolytic tinplate ("ETP") from China and Turkey.  Id. at 1331.  Domestic steel producer U.S. Steel Corporation ("USS") objected to all eight requests, and Seneca and USS proceeded to file rebuttals, surrebuttals, and additional evidence as relevant to each request.  Id. at 1331–32.  As part of its rebuttal materials, and as relevant to each request, Seneca placed on the various administrative records three emails or email chains intended to show the course of dealing between Seneca and USS: (1) one from November 2020, see P.R. 41, (2) another from November 2021, see C.R. 43–44, and (3) a third from February 2022 to April 2022, see C.R. 338–42.  As part of its surrebuttal materials, USS placed on the record BPI reflecting an estimate of how long it would take to produce the steel in each of Seneca's requests.  See C.R. 49–50.

Commerce initially denied Seneca's six exclusion requests submitted in October 2021 and January 2022, finding that USS was able to deliver steel products meeting Seneca's quantity, quality, and timeliness standards.  Seneca I, 663 F. Supp. 3d at 1334.  Commerce also denied Seneca's final two March 2022 Requests, but in the underlying ITA memoranda declined to issue a complete analysis of the quantity, quality, and timeliness criteria.  Id. at 1334–35.

Court No. 22-00243                                                                 Page 8
**PUBLIC VERSION**

On August 19, 2022, Seneca challenged Commerce's denials in a timely action before the

U.S. Court of International Trade ("USCIT").  Compl. at 1, Aug. 9, 2022, ECF No. 6.  Seneca

complained that Commerce's denials of the October 2021 and January 2022 Requests were

arbitrary and capricious under the APA, arguing that Commerce "(1) failed to meaningfully

consider relevant factors when making its determinations, (2) failed to follow its own published

interpretation of its regulations that evidence of past unavailability is relevant to the resolution of

new exclusion requests, (3) failed to adequately explain the basis for its determinations, and (4)

failed to meaningfully consider the evidence before it."  Id. at 31–32.  Seneca also claimed that

Commerce's denials of the March 2022 Requests were arbitrary and capricious on account of

Commerce's inadequate explanation of the bases for its decisions, which amounted to inconsistent

treatment of these requests as compared to Seneca's prior requests.  Id. at 32–33.  USS filed a

motion to intervene in the case, which the court denied.  See Seneca Foods Corp. v. United States,

46 CIT __, __, 607 F. Supp. 3d 1295, 1301 (2022).

On October 18, 2023, the court issued an opinion concluding that Commerce's denials of

Seneca's October 2021 and January 2022 Requests were arbitrary and capricious under the APA.

Seneca I, 663 F. Supp. 3d 1325.  The court stated that "the denials of the October 2021 Requests

and of the February 2022 Requests were both too threadbare in addressing whether USS would be

able to meet 100 percent of Seneca's demand, and Commerce's reasoning for crediting USS's

statements was not otherwise reasonably discernible."  Id. at 1336.  As for Commerce's denials of

the March 2022 Requests, the Government requested a voluntary remand, which Seneca did not

oppose.  Id. at 1342.  The court granted that request without reaching the merits.  Id.  The court

accordingly remanded all eight denials for Commerce's reconsideration or further explanation.  Id.

Court No. 22-00243                                                                                               Page 9
*PUBLIC VERSION*

at 1340–42.

Commerce filed the <u>Remand Results</u> on April 1, 2024.  On remand, Commerce reviewed Seneca's eight exclusion requests anew and denied each one for the second time.  For the October 2021 Requests, Commerce concluded that USS had satisfied the availability criteria based on its representations of capacity to meet Seneca's demand quicker than the import delivery timeframe required by Seneca's foreign supplier.  <u>Id.</u> at 3–7.  Interpreting the November 2021 emails as referring to contractual sales only, Commerce determined that the email evidence did not foreclose the availability of spot sales and thus did not contradict USS's certification that it could timely produce Seneca's requested product volume.  <u>Id.</u> at 5, 7.  Commerce also excluded the November 2020 email from its analysis.  The agency reasoned that the November 2020 email fell outside of the 90-day sales correspondence window typically considered by the agency, referenced a period of time long before the request was filed, and was too vaguely worded to conclusively refer to the steel products at issue.  <u>Id.</u> at 2.  For the January 2022 and March 2022 Requests, Commerce again credited USS's certifications.  The agency concluded that the November 2021 emails, while purportedly showing unavailability in February 2022, did not show unavailability by USS's averred delivery date.  <u>See id.</u> at 8–10.  Commerce also considered but declined to weigh the February 2022–April 2022 emails, which were deemed irrelevant because they were dated four months after Seneca placed its purchase order with the foreign supplier.  <u>Id.</u> at 10–11.  The chart below summarizes Seneca's exclusion requests and the evidence submitted in support of each.

| Table 1: Summary of Evidence Submitted for Each Exclusion Request | | | | |
|---|---|---|---|---|
| **Shorthand** | **Request Number(s)** | **Import Delivery Timeframe Considered by Commerce** | **Emails Submitted as Support for Seneca's Request** | **Emails That Commerce Considered** |
| October 2021 Requests | 257423; 257428 | April 9, 2022 (170 days) | November 2020 email; November 2021 emails | November 2021 emails |

Court No. 22-00243                                                                          Page 10
***PUBLIC VERSION***

| October 2021 Requests | 257708; 257709; 257712 | October 16, 2022 (360 days) | November 2020 email; November 2021 emails | November 2021 emails |
|---|---|---|---|---|
| January 2022 Requests | 275504 | January 18, 2023 (360 days) | November 2021 emails | November 2021 emails |
| March 2022 Requests | 283368; 283369 | March 10, 2023 (360 days) | November 2021 emails; February–April 2022 emails | November 2021 emails; February–April 2022 emails |

Commerce also separately addressed two issues intertwined with all of the requests. First, Commerce stated that "[a]side from addressing the specific arguments in this case, Commerce does not otherwise consider spot sales versus contract sales in its analysis for whether the objector can meet the timeliness or quantity criteria." Id. at 11. Second, Commerce explained that it "does not generally give considerable weight to the evidence of history or interactions of requestors and objectors in its analysis unless it is clearly related to a denial of a prior request for the same product, or clearly indicative of the parties' future dealings." Id. at 12. And because there may be other, non-capacity reasons why companies would turn down an opportunity to supply steel, certain prior circumstances do not necessarily "impact a company's ability to produce and supply a product domestically for any company or the same company in the future. Commerce therefore finds it irrelevant that U.S. Steel has not sold to Seneca for more than two years." Id.

### III.    Procedural History

Seneca filed its complaint on August 19, 2022. See Compl. The court issued its decision with respect to Commerce's initial denials on October 18, 2023. See Seneca I, 663 F. Supp. 3d. Pursuant to the court's order, Commerce filed a remand redetermination on April 1, 2024. See ECF No. 58. On May 1, 2024, Seneca filed its comments on Commerce's redetermination, to which Commerce filed a response on June 14, 2024. See Pl.'s Cmts.; Def.'s Resp., June 14, 2024, ECF No. 66.

The court issued questions in advance of oral argument, see Letter re: Qs. for Oral Arg., July 5, 2024, ECF No. 70, to which the parties filed responses, see Def.'s Resp. to OAQs, Jul. 18, 2024, ECF No. 71; Pl.'s Resp. to OAQs, Jul. 18, 2024, ECF No. 72.  The court also issued supplemental questions for the parties' consideration at oral argument, which was held on June 22, 2024.  See Letter re: Supp. Qs. For Oral Arg., Jul. 22, 2024, ECF No. 74.  The court invited the parties to file post-oral argument submissions by July 29, 2024, see Oral Arg., July 22, 2024, ECF No. 75, and both parties made such submissions.  See Pl.'s Post-Arg. Subm., July 29, 2024, ECF No. 80; Def.'s Post-Arg. Subm., July 29, 2024, ECF No. 79.

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction lies under 28 U.S.C. § 1581(i), which defines the USCIT's residual jurisdiction over civil actions arising under federal laws providing for "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."  28 U.S.C. § 1581(i)(1)(B).[3]  In § 1581(i) cases, the court applies the standard of review set forth by the APA and will "hold unlawful and set aside [agency] action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1331 (Fed. Cir. 2008) (citing 5 U.S.C. § 706(2)), which includes compliance with the court's remand order, see SMA Surfaces, Inc. v. United States, 47 CIT __, __, 658 F. Supp. 3d 1325, 1328 (2023).

Agencies are required to have "engaged in reasoned decisionmaking."  Judulang v. Holder,

---

[3] In Seneca I, the court stated that jurisdiction existed under § 1581(i)(2).  The citation to that subsection, which defines limitations on the USCIT's residual jurisdiction, is a typographical error.  The proper citation is to § 1581(i)(1).

565 U.S. 42, 53 (2011).  They must "examine the relevant data" and "articulate a satisfactory explanation" for their ultimate decisions.  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  And those decisions must be supported by a "rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).  But when agency action has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," it is arbitrary and capricious under the APA.  State Farm, 463 U.S. at 43; see also 5 U.S.C. § 706(2). The court's review of agency action is "narrow" and does not "substitute [the court's] judgment for that of the agency."  State Farm, 463 U.S. at 43.

## DISCUSSION

Seneca argues that Commerce's renewed denials of Seneca's requests are arbitrary and capricious for (1) disregarding or failing to address record evidence of USS's inability to supply steel, (2) acting contrary to Commerce's regulations and prior practice, and (3) failing to consider course-of-dealing evidence in evaluating Section 232 exclusion requests.  See Pl.'s Cmts. at 1–3.

None of these contentions prevails.  Commerce's renewed denials rely on an improved, discernable path detailing the agency's consideration of the record evidence.  The reasoned explanation on this record satisfies Commerce's APA obligations.[4]  Commerce's eight denials in

---

[4] Seneca does not challenge the reasonableness of Commerce's "entire system" governing exclusion requests as applied to all requesters and limits its arguments to the records presented in this case.  See Pl.'s OAQ Resp. at 6.

the Remand Results are sustained.

### I.    *Commerce's Denials Were Supported by Record Evidence*

Seneca first argues that Commerce improperly disregarded record evidence in making its determinations.  Seneca's case for the unavailability of steel from USS rests largely on three emails, which, according to Seneca, compelled Commerce to have granted all eight exclusion requests:

- An email on November 13, 2020, sent internally within Seneca, stating: "[USS is] not offering anything now at any price.  They say if they have available production in any month, they will contact us and see if we have interest.  They just don't want to commit to anything right now."  P.R. 41.

- Emails on November 29, 2021 between Seneca and USS.  The subject is "2022 STEEL AVAILABILITY."  Seneca first states: "When we talked a couple months ago, you advised USS has no tinplate or TFS to offer us for 2022. You did say that if your production efficiencies are good, some availability may free up later in the year. I understood that was kind of a long shot. Has anything changed on the availability of ETP or TFS?"  USS responds: "Right now for Feb I don't have anything as of yet, if that changes I'll let you know."  C.R. 43.

- An email chain from February 2022 to April 2022 between Seneca and USS. In this exchange, Seneca requests a large order (3,000 tons) of a particular steel product.  USS offers a small fraction [[          ]] of Seneca's requested quantity.  USS's initial timing is for [[          ]], but due to delayed responses as well as USS's shifts in timing, the parties appear to settle on a [[          ]] timeline.  C.R. 340–42.

The court leaves Commerce's interpretation and treatment of these emails undisturbed.

To reach its determinations, Commerce is permitted to rely on parties' factual statements to determine their ability to meet their obligations as long as that reliance constitutes "reasoned decisionmaking."  Judulang, 565 U.S. at 53; see also State Farm, 463 U.S. at 43; 5 U.S.C. § 706(2). "It is the [agency's] task to evaluate the evidence it collects . . . Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."

U.S. Steel Grp. v. United States, 96 F.3d 1352, 1357 (Fed. Cir. 1996).  And "the burden of creating an adequate record lies with [the interested parties] and not with Commerce."  QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011).

In each of its objections to Seneca's exclusion requests, USS certified that it would be able to meet 100 percent of requested demand.  See P.R. 28, 78, 127, 176, 225, 274, 325, 370.  The problem with Commerce's denials in Seneca I, the court explained, was not that the agency accepted USS's representations but rather that it failed to make apparent its rationale for crediting USS's representations despite Seneca's email submissions.  See 663 F. Supp. 3d at 1338–39. Commerce was directed to "articulate on remand—and potentially reconsider—why it credits USS's statements about spot sale capacity in light of Seneca's representations and email evidence." Id. at 1339.  Commerce has done so on remand.

First, Commerce decided not to give any weight to the November 2020 email because it was too dated to be probative of USS's steel availability in October 2021.  That decision was reasonable.  One criterion for Commerce's consideration of exclusion requests is whether the "the amount that is needed by the [requester] is not available immediately in the United States to meet its specified business activities."  15 C.F.R. pt. 705 supp. 1(c)(6)(i) (emphasis added).[5]  The email was dated eleven months before the exclusion request and stated that USS did not have capacity "right now."  The agency then referenced "the ever-changing nature of steel and aluminum production schedules and industry" as reason to doubt that an eleven-month-old email accurately

---

[5] As explained above, see supra Introduction part I, the term "immediately" refers to the longer of (i) eight weeks or (ii) the time required for the requester to obtain the entire quantity of identical product from a foreign supplier, running from the date of the exclusion request.  Id.

represented USS's production capabilities.  Remand Results at 2.  The November 2020 email

therefore did not compel the agency to conclude that USS could not have supplied all of Seneca's

steel needs in October 2021.

Commerce next concluded that the November 2021 emails were not probative of USS's

ability to supply steel to Seneca via spot sales.  Commerce based its interpretation of the November

2021 emails on two other portions of record evidence.  First, USS certified in the records of all

five October 2021 Requests that USS was offering "spot sales—not contract sales—for 2022," that

Seneca's rebuttal focused only "on contract volumes and failed to mention that [USS] has recently

offered [Seneca] spot sale volumes," and that "Seneca ha[d] not pursued this option."  P.R. 46–47.

In the record for the January 2022 Request, USS similarly stated that it could supply spot shipments

beyond the quantity requested by Seneca.  C.R. 297.  Second, other statements by Seneca support

Commerce's interpretation that its prior interactions with USS were focused on contract volume

rather than spot volume:

- "If USS is able to contract for 2022 volumes, it will mark a significant departure from recent years, as the last time that USS agreed to supply contracted volumes was for deliveries in 2018."  P.R. 37.

- "Unfortunately, all indications received thus far suggest that USS will not supply Seneca with any contracted volume for next year.  Like last year, Seneca a few days ago engaged USS for volumes to be delivered in 2022, but USS offered nothing."  P.R. 37–38.

- "Unfortunately, in our experience, Seneca cannot look to USS as a dependable source of steel supply. No contract volumes have been made available to Seneca by USS since our orders for deliveries during 2018."  P.R. 38.

These references to the record suffice to establish "a rational connection between the agency's

factfindings" that Seneca's email does not undermine USS's certification of spot availability and

the agency's ultimate action of denying the exclusion requests.  In re Gartside, 203 F.3d 1305,

1312 (Fed. Cir. 2000).

Commerce's interpretation is lawful.  To the extent that Seneca asks the court to credit its

version of events, the court is not compelled to do so here.  It is true that the November 2021

emails make no mention of spot or contract sales.  See C.R. 43.  And as the court has previously

noted, Seneca repeatedly complained of the lack of any additional volume, not just the lack of

contractual volume.  See Seneca I, 663 F. Supp. 3d at 1337 (citing P.R. 20–22, 33–34, 36–37).

But in judicial review of agency action, the court may not reweigh the evidence before the agency

or substitute the agency's reasoned decisionmaking with its own.  See Nippon Steel Corp. v. Int'l

Trade Comm'n, 345 F.3d 1379, 1381–82 (Fed. Cir. 2003); In re Section 301 Cases, 47 CIT __, __,

628 F. Supp. 3d 1235, 1248 (2023).  Because Commerce's determination is rational and adequately

supported, it must be sustained, even though it might be possible to draw "two inconsistent

conclusions from the evidence." Corephotonics, Ltd. v. Apple Inc., 84 F.4th 990, 1001 (Fed. Cir.

2023) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).[6, 7]

Finally, Commerce determined that the February 2022–April 2022 emails were not

relevant to the March 2022 Requests because the emails were dated four months after Seneca had

---

[6] While this language usually describes the substantial evidence standard, "in their application to
the requirement of factual support the substantial evidence test and the arbitrary or capricious test
are one and the same."  United Steel v. Pension Ben. Guar. Corp., 707 F.3d 319, 325 (D.C. Cir.
2013) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve
Sys., 745 F.2d 677, 683 (D.C. Cir. 1984)).

[7] As mentioned above, Commerce stated that "[a]side from addressing the specific arguments in
this case, Commerce does not otherwise consider spot sales versus contract sales in its analysis for
whether the objector can meet the timeliness or quantity criteria."  Remand Redetermination at 11.
Seneca takes issue with that analysis, contending that "Commerce later contradicts itself by

placed its orders from foreign suppliers.  That also passes muster.  In the March 2022 Requests, Commerce was tasked with determining whether USS would have been able to supply the requested quantities of TFS and ETP within the timeframe needed by Seneca's Chinese and Turkish suppliers.  See Remand Results at 10.  It is true that Seneca's initial email expresses broad interest in a variety of steel products and that it shows the difficulty of placing a particular order with USS on a short timeframe.  But the email chain simply does not pertain to the particular orders that later went fulfilled by foreign suppliers.  So it is far from definitive that the email establishes either that USS had no steel products available[8] or that USS was unable to timely produce the

---

claiming that the distinction between contract sales and spot sales is irrelevant to its analysis and that it affords no substantive weight to a distinction that its own analysis introduces."  Pl.'s Cmts. at 18.

That argument misreads Commerce's point.  All that Commerce makes clear is that its ultimate goal is to determine whether USS can produce the steel articles at all, whether by spot or contract. See Remand Redetermination at 11.  Exclusion is warranted if an item "is not produced in the United States in a sufficient, reasonably available amount . . . ."  15 C.F.R. pt. 705, supp. 1(c)(5)(i) (emphasis added).  This condition does not appear, on its face, to permit exclusion merely on account of a buyer's preference for contact sales over spot sales.

The terms of sale can still be relevant to the core availability inquiry if there is evidence suggesting that they are relevant to the domestic producer's ability to produce steel.  Here, the spot-versus-contract distinction was relevant because the parties disputed whether the November 2021 emails showed USS's inability to supply any steel (regardless of spot or contract) or just some steel (conditional on contract).  And resolving that factual dispute was clearly relevant to the broader inquiry of whether USS can produce steel, whether by spot or contract.

[8] Seneca maintains that this email chain was about "any and all products."  Pl.'s Cmts. at 14.  That interpretation is not persuasive, let alone compelled by the record evidence:  Seneca's Vice President for Strategic Sourcing states that Seneca would "be interested in about any spec" that can be offered.  He then follows up with a particular spec, "116RS," and tonnage, "3,000 tons," [[

]] C.R. 341.

quantity requested by Seneca in that email chain.[9]  The agency was not required to reach that speculative conclusion.

Commerce reasonably relied on USS's certifications, and none of Seneca's attached emails compelled Commerce to conclude otherwise.  In Seneca I, Commerce erred by failing to address countervailing evidence and only cursorily acknowledging the seemingly supportive emails.  Its reasoned decisionmaking has now been made clear on remand.  Ultimately, and as noted above, "the burden of creating an adequate record lies with [the interested parties] and not with Commerce."  QVD Food, 658 F.3d at 1324.  USS bore a burden to "identify how it will be able to produce and deliver the quantity of steel . . . needed" as part of its obligation to "clearly identify, and provide support for, its opposition to the proposed exclusion."  15 C.F.R. pt. 705, supp. 1(d)(4).  But Seneca also bore a burden to establish that the steel article was "not produced in the United States in a sufficient, reasonably available amount, and of a satisfactory quality."  Id. pt. 705, supp. 1(c)(5)(i).  Seneca's eight requests hinge collectively on three short email chains, each suffering from various deficiencies as to relevance.  Commerce weighed what the parties submitted to it. Lacking additional evidence, Seneca "simply ask[s] too much of the court to wade into fact finding on a sparse record."  SMA Surfaces, Inc. v. United States, 47 CIT __, __, 617 F. Supp. 3d 1263, 1279 (2023) (internal quotation marks and citation omitted).  The court therefore affirms the factual sufficiency of Commerce's denials of all eight exclusion requests.

---

[9] [[



                                                                                                        ]]

## II.    Commerce's Denials Did Not Contravene Regulations and Prior Practice

Seneca next argues that Commerce's denials of Seneca's requests are arbitrary and capricious because aspects of the decisionmaking underlying the denials departed from the agency's own regulations and prior practice.  See Pl.'s Cmts. at 19.  Commerce generally may not "appl[y] different standards" to "similarly situated" entities without "a reasoned explanation and substantial evidence."  Euzebio v. McDonough, 989 F.3d 1305, 1322 (Fed. Cir. 2021) (internal quotation marks and citation omitted).  And "though past agency decision-making may not be precedential in the same way as case law through stare decisis, it remains of great importance . . . nearly seventy years of Supreme Court and Federal Circuit precedent recognize an agency's duty to address departure from prior norms and policies."  DAK Ams. LLC v. United States, 44 CIT __, __, 456 F. Supp. 3d 1340, 1355–56 (2020) (citations and footnote omitted), aff'd, 829 F. App'x 529 (Fed. Cir. 2020).  Here, though, none of Seneca's three identified bases for this asserted agency practice–related error is availing.

Seneca first cites three unrelated denials by Commerce of steel exclusion requests under Section 232 as evidence of a past agency practice that Commerce has contravened here.  Those three requests were filed on July 29, 2022, by the same requester, Borusan Mannesmann Pipe U.S. Inc. ("Borusan"), in relation to varying steel products and quantities.  See ECF No. 62, at 68–85.[10] In those requests, objector Zekelman Industries ("Zekelman") certified that it could supply 100

---

[10]  See also Request No. 312626, U.S. Dep't of Com., https://232app.azurewebsites.net/Forms/ ExclusionRequestItem/312626 (last visited Oct. 16, 2024); Request No. 312627, U.S. Dep't of Com., https://232app.azurewebsites.net/Forms/ExclusionRequestItem/312627 (last visited Oct. 16, 2024); Request No. 312628, U.S. Dep't of Com., https://232app.azurewebsites.net/Forms/ ExclusionRequestItem/312628 (last visited Oct. 16, 2024).

Court No. 22-00243                                                                   Page 20
**PUBLIC VERSION**

percent of Borusan's requested volume.  Borusan attached email correspondence between itself

and Zekelman from May 2022.  Commerce reasoned, in relation to all three requests, that

Zekelman's showing was insufficient:

> Zekelman's response indicated it does not currently have the capacity to provide
> the requested product.  SME analysis confirms the requested product and the
> product detailed in the emails provided by Borusan match.  The email evidence
> provided by Borusan contradicts Zekelman's claim that it can provide the requested
> quantity.  As such, Zekelman does not meet the quantity criterion.

ECF No. 62, at 70, 76, 82.[11]

Commerce's reasoning as to Zekelman's objections to the three Borusan requests does not

control the outcome here.  Seneca has not shown how the Zekelman-specific reasoning Borusan

denials, which relied on the same piece of evidence and functionally operate as a single instance

of Commerce's practice, are evidence of an established agency practice that Commerce has

contravened here.  See In re Section 301 Cases, 570 F. Supp. 3d at 1347 (defining an "agency

practice" from which unexplained deviation is unlawful as "the existence of 'a uniform and

established procedure . . . that would lead a party, in the absence of notification of a change,

reasonably to expect adherence to the established practice or procedure.'" (quoting Ranchers–

Cattlemen Action Legal Found. v. United States, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1374

(1999))). The Zekelman-specific reasoning in the Borusan denials is better understood as evidence

of Commerce's "exercise of discretion on a case-by-case and fact-specific basis."  Id. (internal

quotation marks and citation omitted).  Commerce exercised its discretion there and here on a fact-

---

[11] Commerce nevertheless denied each of Borusan's exclusion requests because it found that "at
least one objector" besides Zekelman "meets the quality, quantity, and timeliness criteria."  Id. at
68, 74, 80.

Court No. 22-00243                                                         Page 21
*PUBLIC VERSION*

specific basis, and the Borusan requests are not similar enough to suggest error in this case.[12]

Second, Seneca argues that when Commerce evaluates timeliness, the proper starting point should be the dates on which Seneca placed the purchase orders with the foreign suppliers rather than the dates of the exclusion requests.  See Pl.'s Cmts. at 24.  Questions involving the timing of administrative proceedings "generally implicate Commerce's procedural, not policymaking, discretion."  Goodluck India Ltd. v. United States, 43 CIT __, __, 670 F. Supp. 3d 1353, 1371 (2023).  The court's limited task in such a circumstance is to review whether Commerce abused that discretion.  See Stupp Corp. v. United States, 5 F.4th 1341, 1349 (Fed. Cir. 2021).  But Seneca cites no regulation, agency practice, or other authority to suggest that Commerce's choice of a starting date is an abuse of discretion.  As the Government explains, some requesters are like Seneca and submit their exclusion requests after purchase orders with foreign suppliers, and other requesters file the exclusion request first.  Commerce's choice of setting the starting point at the filing date keeps the timeliness inquiry consistent across all scenarios.  See Def.'s Resp. at 16.  Seneca's choice of starting point may be reasonable, but so is Commerce's.  Under arbitrary-and-capricious review, Commerce's approach is lawful.

---

[12] Regarding the January 2022 Request, Seneca relatedly argues that Commerce should have evaluated the timeliness and quantity criteria separately when reviewing the attached November 2021 email as opposed to reviewing the email for only the timeliness prong.  See Pl.'s Cmts. at 23.

It is unclear why that distinction matters here.  Commerce must find that both the timeliness and quantity promised by an objector are insufficient to the foreign alternative.  So failure of either means failure of the whole exclusion request.  The timeliness and quantity inquiries are two sides of the same "sufficient and reasonably available amount" criterion, which is defined to mean "that the amount that is needed by the end user requesting the exclusion is not available immediately in the United States to meet its specified business activities."  15 C.F.R. pt. 705 supp. 1(c)(6)(i).

Court No. 22-00243                                                                    Page 22
*PUBLIC VERSION*

Third, Seneca contends that Commerce erred in its calculation of timeliness by double

counting the shipping time in its equation.  <u>See</u> Pl.'s Cmts. at 25.  In its form, Commerce collects

information from requesters in two fields:

> 2.d.  Estimate the number of days required to take delivery of the product covered
> by this Exclusion Request, from the time the purchase order is issued by your
> organization[.]

> 2.f.  Estimate the number of days required to ship the product covered under this
> Exclusion Request, from the foreign port of departure to the Exclusion Requester's
> loading dock[.]

P.R. 6.  Commerce then "determines the Requestor's import delivery time by adding the numbers

in 2[.]d and 2[.]f of the exclusion request form, plus any appropriate adjustments based on evidence

provided in any submitted documentation."  <u>Id.</u>  Seneca contends that adding those two values

double-counts the time of shipping from a foreign port to the requester's loading dock if the terms

of purchase include the seller's delivery to the buyer under CIF or DDP shipping terms.[13]  <u>See</u>

Pl.'s Resp. to OAQs at 9–10.  If the requester "take[s] delivery" in the United States, then adding

2.d and 2.f would indeed double-count the shipping time.  USS also appeared to acknowledge as

much when it certified to Commerce that it could deliver Seneca's requested steel within Seneca's

---

[13] CIF, or "cost, insurance, and freight," is "[a] mercantile-contract term allocating the rights and
duties of the buyer and the seller of goods with respect to delivery, payment, and risk of loss,
whereby the seller must (1) clear the goods for export, (2) arrange for transportation by water, (3)
procure insurance against the buyer's risk of damage during carriage, and (4) pay the costs of
shipping to the port of destination."  <u>Cost, Insurance, and Freight</u>, Black's Law Dictionary (12th
ed. 2024).

DDP, or "delivered duty paid," is "[a] mercantile-contract term allocating the rights and duties of
the buyer and the seller of goods with respect to delivery, payment, and risk of loss, whereby the
seller must (1) clear the goods for export, (2) bear the costs of carriage, (3) pay the buyer's import
duties, and (4) make the goods available to the buyer on board the carrier at the destination."
<u>Delivered Duty Paid</u>, Black's Law Dictionary (12th ed. 2024).

Court No. 22-00243                                                                      Page 23
**PUBLIC VERSION**

2.d estimate, rather than the sum of Seneca's 2.d and 2.f estimates. See P.R. 28, 78, 127, 176, 225, 274, 321, 370. Defendant states that its method is "standardized" and notes that the requester may use the narrative portions of the form to provide information about shipping times. Def.'s Post-Arg. Subm. at 2.

As an initial matter, Seneca has forfeited this issue. Commerce's formula was made apparent in its initial set of denials, see, e.g., P.R. 5 (reciting the formula and stating that Seneca reports 170 days for import delivery time). But Seneca did not raise it in the Complaint or in the first round of USCIT briefing. See Dorbest Ltd. v. United States, 604 F.3d 1363, 1375–77 (Fed. Cir. 2010).

Even assuming Seneca's preservation of its assertion of error, and assuming further that Commerce's erred in double-counting,[14] such error would be harmless here. The APA requires that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; see also Intercargo Ins. Co. v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the review of agency proceedings."). On these particular facts,

---

[14] The Government appears to suggest that the use of formula which adds 2.d and 2.f, "plus any appropriate adjustments based on evidence provided in any submitted documentation," creates a default rule whereby Commerce assumes that requesters take delivery outside the United States unless there exists some positive indication to the contrary. In theory, that would push the burden of rebutting that assumption onto requesters, and Commerce would issue the "appropriate adjustment[]" by excluding 2.f upon a sufficient showing.

That system would possibly be permissible if it ensured the provision of some notice to requesters that the 2.d and 2.f values would be added. But Commerce's formula does not appear in the rules on the steel exclusion request process. See 15 C.F.R. pt. 705 supp. 1. Instead, Commerce publishes notice of its formula in the final ITA memorandum recommending the grant or denial of the exclusion request. By that point, the exclusion request has been decided and any notice to a requester is provided too late.

Court No. 22-00243                                                                                      Page 24
**PUBLIC VERSION**

Commerce's analysis in the <u>Remand Results</u> would have remained unaffected whether Seneca's foreign supplier time was estimated at 120 (for TFS) and 270 (for ETP) versus 170 (for TFS) and 360 (for ETP).  Commerce credited USS's certified statements, which relied exclusively on the more conservative estimates in stating that USS could timely produce Seneca's requested product. And insofar as Commerce's analysis in the <u>Remand Results</u> hinged on timeliness instead of quantity, it was Seneca's emails, and their relative timing to the filing dates, that were problematic. The differential on the backend of USS's allotted timeframe was not dispositive.

Fourth, Seneca argues that Commerce departed from its regulations by concluding on remand that it "does not generally give considerable weight to the evidence of history or interactions of requestors and objectors in its analysis unless it is clearly related to a denial of a prior request for the same product, or clearly indicative of the parties' future dealings." <u>Remand Results</u> at 12.  Seneca states that this reasoning contradicts Commerce's statements that the "rebuttal process allows the exclusion requester to document in the rebuttal the past activity with the objector." <u>Interim Final Rule</u>, 85 Fed. Reg. at 81065.  But Seneca's quotation is selective; the two sets of statements are easily reconcilable.

In the interim final rule Commerce expressly acknowledged Seneca's concern, shared with at least one commenter on the rule, that the current process "could lead to the negation of exclusion requests in situations where one company files an objection that claims that it in theory could make that product in sufficient quantity or quality." <u>Id.</u>  The agency's solution to that issue is outlined below:

> (1) The requester files an initial exclusion request, and an objector is allowed to object with a certification that it can supply the requested steel articles.

(2) Commerce decides the initial exclusion request.  Of course, in so doing, it can grant the request on the basis that the objector's certification is unwarranted.

(3) But if the first exclusion request is denied because the agency reasonably credits the objector's certification, then the requester should place an order with the objector.  That way, "the exclusion requester will be able to determine definitively whether an objector is in fact able" to supply the steel article.  Id. at 81065.

(4) If the objector cannot supply the steel article, the requester can file a new exclusion request for the same steel article.  "If the same objector objects to the new exclusion request, the rebuttal process allows the exclusion requester to document in the rebuttal the past activity with that objector."  Id. at 81066.

Here, Commerce stated that it generally did not weigh course-of-dealing evidence "unless it is clearly related to a denial of a prior request for the same product," which is relevant to step 4 of the process outlined above, or "clearly indicative of the parties' future dealings," which is relevant to determining the veracity of the objector's prospective certifications in steps 2 and 4.  Remand Results at 12.  Commerce, then, did not unlawfully contradict a prior statement in articulating its course-of-dealing practice in the Remand Results.[15]

Fifth, and somewhat relatedly, Seneca suggests that these exclusion requests are at step 4 rather than step 2.  See Pl.'s Cmts. at 27–28.  Seneca points to a set of exclusion requests for prime ETP that it filed in 2018, to which USS objected and which Commerce denied.  See ECF No. 62, at 91–92.  But Seneca never mentioned the 2018 requests on the agency record; nor did it mention the argument that this set of exclusion requests was somehow a follow-on of the 2018 requests.  Because the agency did not have the opportunity to address that argument in the first instance, it is unexhausted for purposes of judicial review.  See Sandvik Steel Co. v. United States, 164 F.3d

---

[15] Because Commerce did not include this reasoning in its initial determinations, the court did not consider it in Seneca I.  See 663 F. Supp. 3d at 1340 n.9; see also SEC v. Chenery Corp., 332 U.S. 194, 199 (1947).

Court No. 22-00243                                                            Page 26

**PUBLIC VERSION**

596, 599 (Fed. Cir. 1998); <u>see also</u> 28 U.S.C. § 2637(d).[16]  The absence of any reference to the 2018 requests goes to the argument's merits, too.  Seneca's exclusion requests shortly followed ETP orders from foreign suppliers.  There is no evidence on this agency record suggesting that those ETP orders were related to the 2018 requests, or that USS violated its 2018 certification that it could supply steel to Seneca.  Commerce accordingly had no obligation to consider Seneca's argument on this score.

The court concludes that Commerce's denials of Seneca's requests were, in most part, consistent with the agency's own regulations and reasonable practice.  The one seeming error, which is ultimately harmless, concerns Commerce's formula for estimating requesters' delivery times.  Commerce could have done more to clarify the meaning of fields 2.d and 2.f, and would do well to provide such clarity with regard to future requests.

### III.    *Commerce's Denials Reasonably Focused on Prospective Evidence of Steel Production*

Seneca's final argument appears to question one aspect of Commerce's Section 232 exclusion request policy.  Seneca contends that Commerce's approach, even if in line with Commerce's own regulations and practice, gives short shrift to course-of-dealing evidence suggesting that the objector will not supply steel.  Commerce's "purely prospective methodology," Seneca argues, "provides no 'relief' at all when on-the-ground market realities contradict objectors' theoretical projections of future availability. . . . Turning a blind eye to an undisputed

---

[16] Seneca states that the 2018 decisions are on the agency's "public docket," were mentioned in the Complaint initiating this litigation, and included in a letter sent to Commerce as it was reconsidering the denials on remand.  <u>See</u> Pl.'s OAQ Resp. at 9–10.  Of course, none of that is on the actual agency record, let alone raised in the first instance.

record of past and present dealings while focusing on hypothetical future dealings renders the entire exclusion process arbitrary." Pl.'s Cmts. at 30.[17]

To be clear, Commerce stated that it "will consider sales correspondence, submitted as evidence, absent additional accompanying information, only if such correspondence occurred within 90 days of the submission of the exclusion request." P.R. 6. That cutoff is reasonable. The Proclamation authorizes Commerce to "provide relief" from duties "for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount" but leaves it to the agency to set the timeframe of permissible evidence. Proclamation, 83 Fed. Reg. at 11627. Commerce's prospective focus is consistent with the tariff's stated purpose and expected effect, ex ante, of enabling "domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production." Id. at 11625. And to that end, Commerce will consider evidence of past dealings that are "clearly indicative of the parties' future dealings." Remand Results at 12. Seneca asks for Commerce's consideration of older course-of-dealing evidence, but nothing compels Commerce to do so.[18]

---

[17] Seneca states that it understands that Commerce's evaluation is not solely prospective and clarifies that it is making the following contention: "if Commerce's current regulations and guidance regarding past dealings with objectors had been properly applied, Commerce would have dismissed U.S. Steel's objections and approved Seneca's requests." Pl.'s OAQ Resp. at 5. But see Pl.'s Cmts. at 30 (calling Commerce's methodology "purely prospective"). In any event, the court addresses this challenge, as raised in Plaintiff's comments, for completeness. See id. at 28–31.

[18] Seneca argues that the APA requires the consideration of older evidence, but the two cases that Seneca cites for that proposition are inapposite. First, in American Petroleum Institute v. EPA, the court held that the petitioner could challenge the EPA's prediction methodology in the years

Court No. 22-00243                                                                                   Page 28
**PUBLIC VERSION**

More to the point, requesters like Seneca are not without administrative recourse when faced with potentially unreliable domestic producers. A requester can submit an initial request after executing foreign purchase orders, undergo the multistep process outlined above if a domestic objector promises but later fails to supply steel, and receive relief from Commerce that is retroactive to the entries associated with the initial request. See 15 C.F.R. pt. 705 supp. 1(h)(2)(iii)(A) ("Companies are able to receive retroactive relief on granted requests dating back to the date of the request's submission on unliquidated entries."); see also Def.'s Resp. at 16, 20–21. Seneca argues that this remedy is insufficient because the retroactive relief would relate back to the renewed exclusion request (step 4) rather than the initial exclusion request (step 2). See Pl.'s OAQ Resp. at 11. But so long as that renewed exclusion request is for the same "unliquidated

---

following its initial adoption because the "reasonableness of adopting a predictive methodology is not the same as the reasonableness of maintaining one in the face of experience; considering whether to maintain a methodology necessarily invites reflection on the success of earlier applications." 706 F.3d 464, 477 (D.C. Cir. 2013) (emphasis omitted). But that case does not control here, where Commerce informally adjudicates each request on its own record. The agency credits prior evidence in some cases, like in the Borusan requests, and not in others, like in this one. Commerce does not adhere to a rigid formula in determining whether to credit such evidence; that determination hinges ultimately on the administrative posture of the specific case.

Second, in Bechtel v. FCC, the court reasoned that while "changes of [agency] policy require a rational explanation, it is also true that changes in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so." 957 F.2d 873, 881 (D.C. Cir. 1992). In the rulemaking context, the court noted, sufficiently changed circumstances could include "a significant factual predicate of a prior decision" being removed. Id. (internal quotation marks and citation removed). But it is unclear what has changed since the passage of the Presidential Proclamation that would itself prompt Commerce to rethink the prospective focus of its analysis. So long as the tariffs are in place, the President can be presumed to adopt their stated rationale of encouraging domestic steel production. See Cleveland-Cliffs Inc. v. United States, 48 CIT __, __ n.13, 693 F. Supp. 3d 1341, 1360 n.13 (2024) (collecting authorities and noting that "[c]ourts have used inferences of presidential intent to ascertain the continuing effect of presidential proclamations even when the proclaiming president no longer holds office.").

entries" associated with the initial request, the rule's text suggests that Commerce can grant relief to the requester that is functionally the same as relating back to the initial request. Commerce would do well to clarify that point to requesters.

The court appreciates that the task of timing iterative exclusion requests with hurried business needs can be difficult for requesters. But Commerce's procedures, on their face, offered a valid remedy in this case that Seneca did not avail itself of. Having focused on prospective availability and having offered a reasonable administrative process for relief, Commerce has executed denials here that were not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Commerce's denials of the October 2021, January 2022, and March 2022 Requests in the Remand Results are sustained. Judgment on the agency record will enter for Defendant accordingly.

**SO ORDERED.**

/s/      *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: October 21, 2024
New York, New York